IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| M.N. *ex rel.* RODRIGUEZ ) <br> ) <br> Plaintiff, ) <br> ) <br> v. ) <br> ) <br> CAROLYN COLVIN ) <br> Commissioner of Social Security, ) <br> ) <br> Defendant. ) | Case No. 12 C 9367 <br><br> Magistrate Judge Daniel G. Martin |

# MEMORANDUM OPINION AND ORDER

Rhonda Rodriguez ("Rodriguez") filed this action on behalf of her minor son, M.N., seeking review of a final decision of the Commissioner of Social Security ("Commissioner") that denied M.N.'s claim for Social Security Income under Title XVI of the Social Security Act. 42 U.S.C. § 1382(c). The parties have consented to have this Court conduct all proceedings in this case, including an entry of final judgment. 28 U.S.C. § 636(e); N.D. Ill. R. 73.1(c). For the reasons discussed below, Plaintiff's Motion for Summary Judgment is granted.

## I. Legal Standard

### A. The Social Security Administration Standard

Prior to 1996, a child was considered disabled if he or she had a physical or mental impairment that was of comparable severity to one that would disable an adult. 42 U.S.C. § 1382c(a)(3)(A) (1994); 20 C.F.R. § 416.924 (1996); *Scott v. Barnhart*, 297 F.3d 589, 593-94 (7th Cir. 2002). Congress altered this standard under the Personal Responsibility and Work Opportunity Reconciliation Act ("PRWORA") to require a higher showing by a minor

claimant. *Scott*, 297 F.3d at 594 n.5. A child is considered disabled under PRWORA if she "has a medically determinable physical or mental impairment, which results in marked and severe functional limitations" for a period of at least 12 months. 42 U.S.C. § 1382c(a)(3)(C)(i); *Harris v. Barnhart*, 231 F. Supp.2d 776, 779-80 (N.D. Ill. 2002).

To determine if such an impairment exists, the Social Security Administration ("SSA") has promulgated regulations that limit the familiar five-step process that applies to adults to only three steps. The ALJ must answer three questions: (1) is the child engaged in substantial gainful activity? (2) does the child have a medically determinable impairment that is severe? and, (3) do these impairments meet, medically equal, or (unique to child claimants) functionally equal one of a list of severe impairments set forth in the listings? 20 C.F.R. § 416.924(b)-(d). An affirmative answer at Step 1 ends the analysis, and a child must be found not to be disabled regardless of his age or medical condition. 20 C.F.R. § 416.924(b). A negative answer at Step 2 also requires a finding that the child is not disabled. 20 C.F.R. § 416.924(c).

Unlike the Step 3 requirements that apply to adults, the regulations state that a child satisfies the third step when her condition "functionally equals" a listed impairment. 20 C.F.R. § 416.924(d). This requirement permits a finding of disability if a child's impairment or combination of impairments results in one of two possible findings. First, the impairments must give rise to "marked" limitations in two of six "domains of functioning," including (1) acquiring and using information, (2) attending and completing tasks, (3) interacting and relating with others, (4) moving about and manipulating objects, (5) caring for oneself, and (6) health and physical well being. 20 C.F.R. §§ 416.926a(a) & 416.026a(b)(1)(i)-(vi). A limitation is marked if it "interferes seriously" with a child's ability

to independently begin, sustain, or finish activities. 20 C.F.R. § 416.926a(e)(2)(i). Such a limitation is "more than moderate" and is equivalent to what one would expect for the functioning level of a child whose standardized test scores are at least two, but less than three, standard deviations below the mean. *Id*.

In the alternative, impairments functionally equal a listed requirement when they constitute an "extreme" limitation in one of the six domains of activity. 20 C.F.R. § 416.92a(a). A limitation is extreme if it "very seriously" interferes with a child's ability to initiate, sustain, or complete activities. 20 C.F.R. § 416.926a(e)(3)(i). An extreme limitation indicates the "worst limitations," though it does not require a complete loss of functioning. It reflects the functioning level expected for a child whose standardized test scores are at least three standard deviations below the mean. *Id.*

### B. Standard of Review

A claimant who is found to be "not disabled" may challenge the Commissioner's final decision in federal court. Judicial review of an ALJ's decision is governed by 42 U.S.C. § 405(g), which provides that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. § 405(g). Substantial evidence is "such evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971). A court reviews the entire record, but it does not displace the ALJ's judgment by reweighing the facts or by making independent credibility determinations. *Elder v. Astrue*, 529 F.3d 408, 413 (7th Cir. 2008). Instead, the court looks at whether the ALJ articulated an "accurate and logical bridge" from the evidence to her conclusions. *Craft v. Astrue*, 539 F.3d 668,

673 (7th Cir. 2008). This requirement is designed to allow a reviewing court to "assess the validity of the agency's ultimate findings and afford a claimant meaningful judicial review." *Scott*, 297 F.3d at 595. Thus, even if reasonable minds could differ as to whether the claimant is disabled, courts will affirm a decision if the ALJ's opinion is adequately explained and supported by substantial evidence. *Elder*, 529 F.3d at 413 (citation omitted).

## II. Background Facts

### A. School and Medical Records

The medical records show that M.N. was diagnosed with restricted breathing as early as 5.5 months of age. (R. 357). He has received numerous emergency treatments. In September 2003, M.N. had already been given a diagnosis of asthma when he received emergency triage at Provena St. Joseph Hospital for hypoxia. (R. 310). He also went to the ER at Sherman Hospital in September 2006 for breathing problems and was given Albuterol. (R. 404). M.N. presented at Provena St. Joseph in September 2009 for asthma-related issues. (R. 482). His asthma medications include an Advair inhaler, Albuterol (both as an inhaler and a solution), prednisone, Singulair, Xoponex, and Flovent. (R. 27, 180). M.N. also suffers from attention-deficit/hyperactivity disorder ("ADHD"). The earliest diagnosis for ADHD appears to be part of a July 1, 2009 psychiatric evaluation from Aunt Martha's Youth Service Center. (R. 464, 468).

The administrative record contains only a handful of school documents. Report cards for school years spanning 2006 through 2009 show that M.N. met or exceeded most of the expectations set by school officials. (R. 201-07, 248-58). A report for the 2010-11 school year echoed those conclusions. (R. 550-51). Two teacher questionnaires

4

assessed M.N.'s functioning in five of the six domains required for a child disability application. A second-grade assessment found that he had no problems in acquiring and using information. Several "obvious" or "serious" problems were noted in the domains of completing tasks and caring for himself. The scores for interacting with others and manipulating objects also reflect general concerns that were not identified in detail. (R. 272-78). His teacher noted that M.N. had difficulty in following directions, staying on task, and working with others. A behavioral plan had been implemented to track his activities throughout the day. The teacher further noted that M.N. had "extreme difficulties" in moving in a controlled and appropriate manner. (R. 275). The only reference to asthma states that M.N. had suffered from four bad attacks during the year and could not go outside for recess if the temperature was below 55 degrees. (R. 277).

A second report was issued when M.N. was in the third grade. No problems were noted in any of his domains of functioning. (R. 237-41). The only other records include a May 2007 report by a school psychologist, stating that M.N. was doing well academically but had some behavioral problems. (R. 265). A mid-term report for the 2009-10 school year shows that M.N. was performing at a satisfactory level in math, reading, and writing. (R. 260-61).

### B. Testimony

M.N. appeared at a hearing held on June 16, 2011. He was 10 years old at the time and had just graduated from the fourth grade. M.N. stated that he could not participate in sports due to his asthma. He had recently required emergency asthma treatment in school because he had forgotten that he was not allowed to run. His asthma symptoms began to improve a few years earlier when he started using Flovent.

M.N.'s mother confirmed that Flovent had helped to relieve the severity of his breathing problems. Ms. Rodriguez stated, however, that paramedics were required to come to his school twice in the past year to provide treatment. M.N. also had to be taken to Provena St. Joseph's for immediate care. His condition is currently stable as long as M.N. uses a nebulizer every day and does not go out in the cold. He can only play outside when using a "buddy system" with other children. Ms. Rodriguez did not have any academic concerns about her son, though she testified that his asthma medications make M.N. even more active than he ordinarily is. M.N. also suffers from a wide spectrum of allergies, including nuts, beans, berries, soy, pork, wheat, ragweed, boxelder, mold, dust, and cats.

The ALJ took further testimony from medical expert Dr. Sai Nimmagadda. The expert began his statements by noting that he did not have the full record before him. M.N.'s attorney stated that she had submitted some medical records the day prior to the hearing, but they had not yet shown up in the materials available to Dr. Nimmagadda. The medical expert testified that what was before him did not show that M.N. met or medically equaled listing 103.03 (asthma). However, he stated that M.N. would meet the listing if the unavailable records showed "that the exacerbations and the attacks were warranted or [INAUDIBLE] for more than five days and the document was within a 12-month period." (R. 36). Dr. Nimmagadda also determined that M.N. had no limitations in the domains of acquiring and using information and caring for himself. Less than marked limitations were present in attending and completing tasks, manipulating objects, caring for himself, and interacting with others. (R. 35).

### C. Physician Reports

On December 10, 2008, Dr. Cosme Cagas and Dr. John Tomassetti issued a Childhood Disability Evaluation concerning M.N. The state agency physicians determined that he suffered from asthma and "poor behavior," neither of which was found to meet, medically equal, or functionally equal a listing singly or in combination. The doctors assessed M.N.'s domains of functioning in reaching this decision. Claimant was found to have no limitation in acquiring and using information, and had less than marked limitations in the remaining five domains of attending and completing tasks, interacting with others, moving and manipulating objects, caring for himself, and physical well-being. (R. 297-300). Dr. Charles Kenney and Dr. Michael Schneider confirmed these findings on reconsideration in April 2009. (R. 303-06).

### D. The ALJ's Decision

On August 9, 2011, ALJ John Mondi issued a written decision finding that M.N. was not disabled. Employing the three-step method applied to child applicants, ALJ Mondi determined at Step 1 that M.N. had not engaged in substantial gainful activity since his alleged onset date of September 6, 2000. The ALJ decided at Step 2 that M.N. had a severe respiratory impairment. At Step 3, no condition was found not to meet or medically equal a listed impairment. The ALJ also concluded that M.N. did not functionally equal a listing. Accordingly, the ALJ decided that M.N. was not disabled under the definitions of the Social Security Act.

### III. Discussion

Rodriguez challenges the ALJ's Step 3 decision on three grounds. She claims that

(1) evidence in the record shows that M.N. met or medically equaled listing 103.03's criteria for asthma, (2) the ALJ failed to consider the combined effects of his conditions, and (3) the ALJ improperly evaluated whether he functionally equaled listing 103.03.[1]

### A. The Equivalency Standard

A claimant is presumptively disabled if he has an impairment or combination of impairments that meets or medically equals a listing. An ALJ must satisfy three requirements when addressing a listing at Step 3. He must first identify the listing by name. Here, the ALJ referred to "Listing 101.03." That listing involves reconstructive joint surgery, which is inapplicable to M.N. (R. 13). The Court presumes that this was a clerical error that was intended to reference listing 103.03 (asthma).

Second, the ALJ is required to provide an analysis of the listing issue that is "more than . . . perfunctory." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citation omitted). The ALJ's discussion consisted of the following statement: "Reviewing DDS consultants found in April 2009 that the claimant was severely impaired by a history of asthma and poor behavior but that the conditions did not meet or medically equal any impairment in Appendix 1. This assessment remains consistent with [the] record." (R. 14). Third, an ALJ must also consider a medical expert's opinion on the issue in question because the listings involve medical judgments. *Barnett*, 381 F.3d at 670.

The Commissioner claims that the ALJ complied with the third of these requirements when he elicited testimony from Dr. Nimmagadda on whether M.N. met or equaled listing

---

[1] The Court does not address the functional equivalence issue because the first claim requires remand. The ALJ will already have to consider the medical records more fully and will restate his reasoning concerning the ADHD issue. The ALJ should address functional equivalence insofar as it is necessary to do so in light of this evidence.

103.03. The Court respectfully disagrees with the Commissioner that the ALJ properly addressed this issue at the hearing. The record raises serious concerns about what the ALJ and Dr. Nimmagadda believed would satisfy the listing. Listing 103.03 provides four alternative criteria for evaluating asthma. These include, in condensed terms, (1) a growth impairment; (2) a forced expiratory volume equal to or less than the data set forth in listing 103.03; (3) attacks at least once every two months, or six times a year; or finally (4):

> Persistent low-grade wheezing between acute attacks or absence of extended symptom-free periods requiring daytime and nocturnal use of sympathomimetic broncho-dilators with one of the following:
>
> 1. Persistent prolonged expiration with radiographic or other appropriate imaging techniques evidence of pulmonary hyperinflation or peribronchial disease; or
>
> 2. Short courses of corticosteroids that average more than 5 days per month for at least 3 months during a 12-month period.

20 C.F.R. Pt. 404 Subpt. P, App. 1, at ¶ 103.03.

At the hearing, the ALJ focused exclusively on the last requirement (listing 103.03(C)) involving steroid use. He asked the medical expert: "Did you find that there was a 12-month period in which he was prescribed steroids averaging five days each time for five times or more in a 12-month period?" (R. 36-37). The problem with this question is that it incorrectly stated the listing's requirements. The ALJ loosened the listing's demands by asking if M.N. had taken steroids for an average of at least five days. The listing requires a period of "more than 5 days." More importantly, the ALJ then significantly heightened the listing's criteria by inquiring whether M.N. had taken steroids "five times or more" in a year. This imposed a higher standard on M.N. than listing 103.03(C) requires. A claimant does not have to take steroids during five separate time spans in a year to meet

9

the listing. He only needs to take such medication over a five-day period "for at least 3 months." M.N. could have complied with the listing's actual threshold for taking steroids and still not have satisfied what the ALJ believed was necessary to meet listing 103.03(C).

By misconstruing the elements of listing 103.03(C), the ALJ improperly applied the wrong legal standard in evaluating Step 3. That is reversible error. *See Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005). Unfortunately, Dr. Nimmagadda's response did not rectify the ALJ's mistake or clarify the issue. The medical expert stated: "I didn't find a consistent 12 days, or five days in a 12-month period [of steroid use] over a consistent period of time." (R. 37). It is unclear what Dr. Nimmagadda meant by a "consistent" time period, which the listing does not require. The listing only states that a claimant must use steroids in any three-month period during a year. A claimant could satisfy this criterion by taking steroids in three consecutive months, in three months scattered throughout the year, or in any other combination of months during a calendar year. Dr. Nimmagadda never addressed these monthly guidelines for steroid use.

As a result, neither the ALJ's question nor Dr. Nimmagadda's response accurately reflected listing 103.03(C). If the ALJ intended to rely on Dr. Nimmagadda, he was required to explain the appropriate legal standard in his decision and explain how the medical expert's testimony addressed the correct factors under listing 103.03. The decision, however, did not clarify the proper criteria of the listing or state how Dr. Nimmagadda's testimony could be interpreted to address the listing's terms. Thus, the Court disagrees with the Commissioner that the ALJ was entitled to rely on the medical expert's testimony on this part of the Step 3 finding.

The Commissioner also defends the listing issue on a second ground by arguing

that the ALJ properly relied on the opinions of the state agency physicians. Dr. Cagas and Dr. Tomassetti concluded in December 2008 that M.N.'s asthma did not meet or equal a listing. That finding was upheld on reconsideration in April 2009. An ALJ may ordinarily rely on such medical opinions in deciding whether a claimant meets or equals a listing. *Scheck v. Barnhart*, 357 F.3d 697, 700 (7th Cir. 2004). However, that rule does not apply when the ALJ fails to account for contradictory evidence in the record. *Ribaudo v. Barnhart*, 458 F.3d 580, 584 (7th Cir. 2006); *see also Knox v. Astrue*, 327 Fed.Appx. 652, 655 (7th Cir. 2009). A perfunctory citation to state agency physicians that does not discuss contrary evidence can require remand.

The Commissioner claims that the ALJ's discussion was not perfunctory because he discussed M.N.'s hospitalization and his use of inhalers to control his asthma symptoms. These lines of evidence do not address the relevant issues with sufficient care. A claimant's hospitalization is relevant to listing 103.03(B), which sets out the requirements for inpatient hospitalizations of more than 24 hours over a twelve-month period. Even if the ALJ intended to address this aspect of listing 103.03 (which is far from clear), hospitalization is not relevant to the criteria of listing 103.03(C), which was the ALJ's primary focus at the hearing.

As for M.N.'s inhalers, the ALJ's brief discussion of them falls far short of addressing the relevant criteria of listing 103.03(C). That provision obligates an ALJ to consider more than whether a claimant needs to use asthma inhalers to control his symptoms. Listing 103.03(C)(2) refers to a claimant's use of "short courses" of steroids. Many courts have found that this only involves oral steroids such as prednisone. It does not include inhaled corticosteroids that are designed for long-term asthma control. *See, e.g., Correa ex rel.*

11

*Correa v. Comm. of Soc. Security*, 381 F. Supp.2d 386, 396 (D.N.J. 2004); *Sanchez ex rel. Sanchez v. Barnhart*, 2005 WL 752220, at *9 (W.D. Wis. Mar. 30, 2005); *T.V.P. ex rel. Tunstall v. Colvin*, 2013 WL 4678729, at *5 (S.D. Ind. Aug. 28, 2013).

The ALJ overlooked that the record is replete with evidence that M.N. used oral steroids. Dr. Nimmagadda, for example, told the ALJ that M.N. had taken steroids before he began using the inhaler Flovent. (R. 37). The record also contains a prescription for prednisone in September 2009, and Rodriguez stated that he received steroids at the hospital in April 2009. (R. 224, 495, 506, 513, 580). M.N. also received Prelone in a different prescription strength in June 2009. (R. 456). Other prescriptions for prednisone were given by a Dr. Joseph. (R. 180). A school record states that M.N. took prednisone for a five-day period in early 2008. (R. 282). This may have been the prescription of Prelone given in the same month. (R. 529). Prelone was again prescribed in October 2010. (R. 596, 571). A follow-up prescription of Orapred was also given. (R. 574). Other records of the use of oral steroids also exist. (R. 287, 313, 315, 397, 410, 461, 487, 525).

The ALJ's discussion overlooked this entire line of evidence concerning oral steroids. This fails to draw a logical bridge between the record and the ALJ's Step 3 finding and overlooks crucial evidence concerning listing 103.03(C). Moreover, the ALJ could not conclude that the state agency reports were "consistent" with the evidentiary record when several of the prednisone prescriptions were given after the state agency reports were issued. The ALJ was required to account for such contradictory evidence. *See Ribaudo*, 458 F.3d at 584; *Cirelli v. Astrue*, 751 F. Supp.2d 991, 1003 (N.D. Ill. 2010). The ALJ's oversight of an essential element of listing 103.03(C), and his failure to address evidence that post-dated the state agency reports, renders his discussion of this listing

issue perfunctory.

The Commissioner does not argue that the ALJ's oversight on this topic only amounts to harmless error. The Court does not consider that question on its own because special concerns exist in this case about the completeness of the administrative record. Rodriguez told the ALJ that M.N. received prednisone from asthma and allergy specialist Dr. Ghani. These records were not available for the medical expert to review at the hearing. The issue was particularly important because Dr. Nimmagadda testified that he would find M.N. to be disabled if the recently-provided records substantiated the steroid use that M.N's attorney alleged at the hearing. (R. 36). The ALJ left the record open so that the attorney "can make sure we have all of the outstanding evidence." (R. 38). No subsequent documents were received. (R. 10).

The problem with the ALJ's discussion of this issue is that M.N.'s attorney told the ALJ that she had *already* submitted Dr. Ghani's records the day prior to the hearing. (R. 34). She may not have resubmitted the same medical forms in the reasonable belief that what had already been provided would eventually make its way into the record. Clearly, it did not. Dr. Ghani's prescriptions for prednisone could have been important evidence on whether M.N. met listing 103.03. They certainly would have been favorable evidence that the ALJ would have been required to discuss before adopting the state agency physicians' opinions.

Harmless error only exists if a court can state with confidence that the result would be the same on remand. See Spiva v. Astrue, 628 F.3d 346, 353 (7th Cir. 2010). That is not possible when important documents may exist that were not properly considered. An ALJ has the duty to ensure that the record is fully and fairly developed, even when a

claimant is represented by counsel. *See Skinner v. Astrue*, 478 F.3d 836, 843 (7th Cir. 2007). The Court cannot conclude that he did so when the ALJ did not take note that M.N.'s attorney stated that the missing records had already been provided to him.

### B. ADHD and the Combined Impairments

Rodriguez also claims that the ALJ failed to consider whether M.N.'s ADHD met or equaled listing 112.11, which requires that a claimant provide medically-documented findings showing marked inattention, impulsiveness, and hyperactivity. A claimant of M.N.'s age must also demonstrate at least two marked restrictions in the areas of (1) cognitive or communicative functioning, (2) social functioning, (3) personal functioning, or (4) difficulty in maintaining concentration or pace. Rodriguez further claims that the ALJ erred by failing to consider the aggregate effect of M.N.'s asthma and ADHD. The combined impact of all of a claimant's impairments, severe or otherwise, must be "considered throughout the disability determination process." 20 C.F.R. § 404.1523. This includes the listing decision at Step 3. 20 C.F.R. § 404.1423; *Wurst v. Astrue*, 866 F. Supp.2d 951, 960-61 (N.D. Ill. 2012).

The Commissioner again argues that substantial evidence supports the ALJ's finding because he adopted the opinions of the state agency physicians. Several problems stem from this claim. Although it is not outcome determinative, the Court notes that the ALJ did not, in fact, adopt these reports in their entirety. The state experts concluded that M.N.'s asthma and "poor behavior" were serious impairments, but that they did not meet or medically equal a listing either singly or in combination. (R. 287). The ALJ rejected the conclusion that poor behavior was a severe limitation for M.N. He only found at Step 2 that M.N.'s asthma was severe.

The deeper problem, however, is that the expert reports that the Commissioner relies on do not mention ADHD. The state agency doctors only cited "poor behavior." The first medical diagnosis of ADHD was given by a psychiatrist on July 1, 2009, several months after the state's April 2009 reconsideration report. (R. 304, 468). The Commissioner argues that this was not fatal because the ALJ's discussion of M.N.'s behavioral problems sufficiently addressed the ADHD issue. However, this fails to explain how poor behavior and ADHD can be considered as equivalent descriptions of M.N.'s limitation. "Poor behavior" – whatever that means – is a generalized term that can imply any number of things that may or may not overlap with ADHD. By contrast, ADHD is a complex behavioral disorder that is described both in the listings and in standard diagnostic manuals.² These diagnostic criteria go beyond a vague description of "poor behavior."

Courts have found that an ADHD diagnosis itself implies a significant level of inattention, hyperactivity, or impulsivity. "To diagnose a child as having ADHD, a clinician must find either marked inattention or marked hyperactivity over a period of time. Therefore, the ADHD diagnosis alone reflects a medically documented finding of marked inattention, marked hyperactivity, or both." *Taylor ex rel. McKinnies v. Barnhart*, 333 F. Supp.2d 846, 854 (E.D. Mo. 2004). There is no reason to believe that the ALJ considered

---

² The DSM-IV includes three subtypes of ADHD. Six findings are required for a diagnosis in children: (1) six or more of a list of symptoms for inattention; (2) six or more symptoms for hyperactivity-impulsivity; (3) some hyperactive-impulsive or inattentive symptoms that cause an impairment and are present before age 7; (4) some impairment from the symptoms that are present in two or more settings; (5) clear evidence of serious limitations in social, academic, or occupational functioning; and (6) symptoms that do not arise only in the course of another mental disorder. *See* Diagnostic and Statistical Manual of Mental Disorders 92-93 (4th ed. 2000). The Fifth Edition of the DSM, which was introduced after the ALJ issued his decision, includes a number of changes to the DSM-IV criteria.

how M.N.'s behavioral records met or equaled the specific requirements of listing 112.11 when he did not cite that listing or acknowledge that M.N. suffered from ADHD. If the ALJ believed that ADHD and "poor behavior" were the same things, he should have stated that fact and explained his reasoning.

The issue, however, is more complex than the state agency reports suggest. The Commissioner points out that two of the four agency physicians who issued these reports also signed Form SSA-831-C3 Disability Determination and Transmittal letters that *did* include both asthma and ADHD. (R. 45-46). It is exceptionally difficult to understand how the medical experts claimed to have considered the complex factors of listing 112.11 in these pro forma transmittal letters when their more detailed reports were utterly devoid of any mention of ADHD, including any reference to a diagnosis in the medical record. That said, such transmittal letters are evidence that an expert has considered the question of medical equivalence. *See* SSR 96-6p (referring to Form SSA-831-U3); *Ewing v. Astrue*, 2011 WL 3843692, at *7 (N.D. Ohio Aug. 12, 2011) (stating that an ALJ is entitled to rely on such forms as expert opinion on whether a claimant meets or equals a listing); *Hill v. Astrue*, 2009 WL 426048, at *9-10 (S.D. Ind. Feb. 20, 2009). Thus, this Court is bound to accept that a medical expert determined that M.N.'s asthma and ADHD did not meet or equal a listing, either singly or in combination.

That does not mean, however, that the ALJ's Step 3 discussion of the issue was sufficient. The ALJ stated that the record "remains consistent" with the state agency reports. That is a surprising conclusion in light of the fact that the ALJ does not appear to have been aware that M.N. had ever been diagnosed with ADHD. The decision itself never mentions that disorder. The Court notes that the ALJ did not cite the disability transmittal

letters that identified ADHD; he only relied on the agency reports concerning "poor behavior." The psychiatric diagnoses of ADHD that post-dated the state agency reports went unnoticed.

Thus, the ALJ never considered whether M.N.'s formal diagnosis signaled a development in M.N.'s behavioral problems that the ALJ should have considered. M.N.'s condition may have worsened after the non-examining experts reviewed his records, or it may have been essentially the same before and after the ADHD diagnosis. Without discussing the issue, however, the ALJ failed to build a logical bridge between the record, the experts' reports, and his own conclusion.

The Commissioner argues that the ALJ properly considered this issue because he adopted the experts' assessment of M.N.'s six domains of functioning. That is unavailing because the six domains of functioning only apply to the question of whether a child claimant functionally equals a listing. *See* 20 C.F.R. § 416.926a(a); *Hopgood ex rel. L.G. v. Astrue*, 578 F.3d 696, 699 (7th Cir. 2009). The Commissioner further suggests that any error on the ALJ's part was harmless because the record shows that M.N. could not have met the criteria for listing 112.11. As noted, listing 112.11 requires a claimant to show medical evidence of marked inattention, impulsiveness, and hyperactivity. The Commissioner notes that M.N. does not take medication for his ADHD and that his school records do not support the marked limitations required at Step 3.

Despite its serious concerns with the ALJ's discussion, the Court agrees with this argument. Rodriguez did not file a reply brief contesting the harmless error issue, and she provides little reasoning on how M.N. could have met or equaled listing 112.11. *See Alesia v. Astrue*, 789 F. Supp.2d 921, 933 (N.D. Ill. 2011). As a result, the Court does not reverse

17

the ALJ's decision on the ADHD issue. But because the case already requires remand, the ALJ is instructed to address the record in a more complete manner and to account for the ADHD evidence that he overlooked.

## IV. Conclusion

For these reasons, Plaintiff's Motion for Summary Judgment [18] is granted. The ALJ's decision is reversed, and this case is remanded to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for further proceedings consistent with this opinion. It is so ordered.

**ENTERED:**

_____
**DANIEL G. MARTIN**
**United States Magistrate Judge**

Dated: April 22, 2014